IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
SOUTHERN DIVISION

CONNIE K. HILL,                    )
                                   )
            Plaintiff,             )
                                   )
      v.                           )     Case No.
                                   )     05-3313-CV-S-REL-SSA
JO ANNE BARNHART, Commissioner     )
of Social Security,                )
                                   )
            Defendant.             )

### ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Plaintiff Connie Hill seeks review of the final
decision of the Commissioner of Social Security denying
plaintiff's application for a period of disability and
disability insurance benefits under Titles II and XVI of the
Social Security Act ("the Act").  Plaintiff argues that the
ALJ erred in (1) failing to perform a proper credibility
analysis, (2) failing to develop the record by obtaining a
psychological consultative examination, (3) failing to
provide a proper residual functional capacity, and (4)
finding that plaintiff can return to her past relevant work.
I find that the substantial evidence in the record as a
whole supports the ALJ's finding that plaintiff is not
disabled.  Therefore, plaintiff's motion for summary
judgment will be denied and the decision of the Commissioner
will be affirmed.

## I. BACKGROUND

On December 16, 2002, plaintiff applied for a period of disability and disability insurance benefits alleging that she had been disabled since November 21, 2002 (Tr. at 39). Plaintiff's disability stems from headaches, neck and shoulder tendinitis, chest and breast pain, and arthritis of the spine. On January 15, 2003, plaintiff's application was denied. On February 11, 2004, a hearing was held before Administrative Law Judge Martin Spiegel. On June 22, 2004, the ALJ found that plaintiff was not under a "disability" as defined in the Act. On June 9, 2005, the Appeals Council denied plaintiff's request for review. Therefore, the decision of the ALJ stands as the final decision of the Commissioner.

## II. STANDARD FOR JUDICIAL REVIEW

Section 205(g) of the Act, 42 U.S.C. § 405(g), provides for judicial review of a "final decision" of the Commissioner. The standard for judicial review by the federal district court is whether the decision of the Commissioner was supported by substantial evidence. 42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Mittlestedt v. Apfel, 204 F.3d 847, 850-51 (8th Cir. 2000); Johnson v. Chater, 108 F.3d 178, 179 (8th Cir. 1997);

2

Andler v. Chater, 100 F.3d 1389, 1392 (8th Cir. 1996).  The

determination of whether the Commissioner's decision is

supported by substantial evidence requires review of the

entire record, considering the evidence in support of and in

opposition to the Commissioner's decision.  Universal Camera

Corp. v. NLRB, 340 U.S. 474, 488 (1951); Thomas v. Sullivan,

876 F.2d 666, 669 (8th Cir. 1989).  "The Court must also

take into consideration the weight of the evidence in the

record and apply a balancing test to evidence which is

contradictory."  Wilcutts v. Apfel, 143 F.3d 1134, 1136 (8th

Cir. 1998) (citing Steadman v. Securities & Exchange

Commission, 450 U.S. 91, 99 (1981)).

Substantial evidence means "more than a mere scintilla.

It means such relevant evidence as a reasonable mind might

accept as adequate to support a conclusion."  Richardson v.

Perales, 402 U.S. at 401; Jernigan v. Sullivan, 948 F.2d

1070, 1073 n. 5 (8th Cir. 1991).  However, the substantial

evidence standard presupposes a zone of choice within which

the decision makers can go either way, without interference

by the courts.  "[A]n administrative decision is not subject

to reversal merely because substantial evidence would have

supported an opposite decision."  Id.; Clarke v. Bowen, 843

F.2d 271, 272-73 (8th Cir. 1988).

3

### III. BURDEN OF PROOF AND SEQUENTIAL EVALUATION PROCESS

An individual claiming disability benefits has the burden of proving she is unable to return to past relevant work by reason of a medically-determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 423(d)(1)(A). If the plaintiff establishes that she is unable to return to past relevant work because of the disability, the burden of persuasion shifts to the Commissioner to establish that there is some other type of substantial gainful activity in the national economy that the plaintiff can perform. Nevland v. Apfel, 204 F.3d 853, 857 (8th Cir. 2000); Brock v. Apfel, 118 F. Supp. 2d 974 (W.D. Mo. 2000).

The Social Security Administration has promulgated detailed regulations setting out a sequential evaluation process to determine whether a claimant is disabled. These regulations are codified at 20 C.F.R. §§ 404.1501, et seq. The five-step sequential evaluation process used by the Commissioner is outlined in 20 C.F.R. § 404.1520 and is summarized as follows:

4

1. Is the claimant performing substantial gainful activity?

> Yes = not disabled.
> No = go to next step.

2. Does the claimant have a severe impairment or a combination of impairments which significantly limits her ability to do basic work activities?

> No = not disabled.
> Yes = go to next step.

3. Does the impairment meet or equal a listed impairment in Appendix 1?

> Yes = disabled.
> No = go to next step.

4. Does the impairment prevent the claimant from doing past relevant work?

> No = not disabled.
> Yes = go to next step where burden shifts to Commissioner.

5. Does the impairment prevent the claimant from doing any other work?

> Yes = disabled.
> No = not disabled.

## IV.  THE RECORD

The record consists of the testimony of plaintiff and vocational expert Cathy Hodgson, in addition to documentary evidence admitted at the hearing.

## A.  EARNINGS RECORD

The record establishes that plaintiff earned the following income from 1966 through 2003:

5

| Year | Earnings | Year | Earnings |
|------|----------|------|----------|
| 1966 | $    183.45 | 1985 | $ 1,314.06 |
| 1967 | 303.15 | 1986 | 4,165.65 |
| 1968 | 319.13 | 1987 | 5,070.10 |
| 1969 | 483.20 | 1988 | 4,027.23 |
| 1970 | 0.00 | 1989 | 2,226.65 |
| 1971 | 1,136.40 | 1991 | 2,291.13 |
| 1972 | 256.70 | 1991 | 1,401.66 |
| 1973 | 1,475.81 | 1992 | 2,483.77 |
| 1974 | 847.46 | 1993 | 290.07 |
| 1975 | 0.00 | 1994 | 8,151.82 |
| 1976 | 724.10 | 1995 | 8,118.90 |
| 1977 | 3,514.68 | 1996 | 8,947.19 |
| 1978 | 4,548.11 | 1997 | 4,573.23 |
| 1979 | 3,917.32 | 1998 | 14,531.66 |
| 1980 | 4,195.05 | 1999 | 16,076.32 |
| 1981 | 5,459.01 | 2000 | 2,599.13 |
| 1982 | 5,682.54 | 2001 | 3,613.84 |
| 1983 | 0.00 | 2002 | 5,159.67 |
| 1984 | 4,088.52 | 2003 | 0.00 |

(Tr. at 79-84).

**B.    *SUMMARY OF MEDICAL RECORDS***

On February 28, 2001, plaintiff saw Joseph Spurlock, M.D., complaining of left-sided neck pain and bilateral shoulder pain that had been worsening for the past month

6

(Tr. at 190). On exam, he found that plaintiff was
exquisitely tender in the upper back musculature with a lot
of tender trigger points. She was also slightly tender in
the biceps tendon area on the left at the insertion in the
shoulder. Range of motion in the neck was normal and there
was minimal amounts of paraspinous cervical tenderness.
There was no obvious crepitus[1] or limitation of range of
motion. Five views of plaintiff's cervical spine were
reviewed and "did not reveal really any significant amount
of degenerative joint disease and certainly her disk spaces
seem to be well maintained." He assessed neck pain
"probably degenerative as well as some degree of just
myofascial pain" and headaches which he thought were tension
headaches. He prescribed Motrin, a non-steroidal anti-
inflammatory, and Flexeril, a muscle relaxer.

On April 5, 2001, plaintiff saw Dr. Spurlock
complaining of almost daily headaches, frequently around
bedtime (Tr. at 189). He examined her neck and found that
it was normal. He assessed headaches and wrote, "Have asked
her to see Dr. Hamlin to help clarify diagnosis and

---

[1]A clinical sign in medicine characterized by a
peculiar crackling, crinkly, or grating feeling or sound
under the skin, around the lungs, or in the joints.

Case 6:05-cv-03313-REL   Document 10   Filed 05/30/06   Page 7 of 41

treatment." He gave her a trial of Cataflam, a non-steroidal anti-inflammatory.

On July 16, 2001, plaintiff saw L. D. Atkinson, M.D., in connection with her application for benefits (Tr. at 152-163). Plaintiff's chief complaint was tendinitis to her right shoulder for the last three years. "That patient's right shoulder started bothering Ms. Hill while she was working for six months at the poultry plant, Petit Jean. The pain is worse in cold and rainy weather. The right shoulder pain radiates to head and causes a daily headache which lasts all night into the middle of the next day."

Plaintiff was smoking a pack of cigarettes per day and had for the past 30 years. She reported rib cage and back pain with shortness of breath after being up for more than two hours. She also reported depression for eight to nine years with no therapy or evaluation. Dr. Atkinson performed a physical exam and found plaintiff's musculoskeletal system within normal limits. Her x-rays showed a thoracic spine with slight spurring and slight decreased disc spaces. Dr. Atkinson's assessment included repetitive motion injury to right shoulder, tobacco abuse with chronic obstructive pulmonary disease, chronic back pain, and depression. Dr. Atkinson recommended an orthopedic surgeon referral for the

8

repetitive motion injury to the right shoulder and the chronic back pain; discontinue tobacco; and consider depression therapy.

On August 21, 2002, plaintiff saw Dr. Spurlock (Tr. at 185, 188). She complained of pain the previous week which hurt all weekend but then began to feel better. She then felt something "give" while she was at work and was again in pain. Plaintiff was concerned that she had had a stroke; however, Dr. Spurlock found no neurological symptoms to suggest a stroke. Plaintiff had some tenderness at the back of her neck, but the rest of the exam was normal. Dr. Spurlock assessed left neck strain and degenerative disease of the spine with some chronic arthritic pain. He gave her an excuse to be off work for three days and recommended physical therapy. He also prescribed Diazepam, used to treat anxiety.

Plaintiff participated in physical therapy for her neck during the end of August 2002 through mid September 2002 (Tr. at 165-168). In a questionnaire about her neck pain, plaintiff reported that she could do her usual work but no more, she could drive her car without any neck pain, and "As long as I'm on my medicine and not sleepy I can do work." On August 27, 2002, plaintiff said, "You made my headache so

9

much better yesterday." On September 2, 2002, she commented that, "They have me working 5 days in a row for 4-5 hours without much break time." Plaintiff was working at Hardees at the time.

On September 12, 2002, plaintiff was seen at the Dallas County Family Medical Center complaining of neck pain (Tr. at 204). The doctor diagnosed neck strain and prescribed Darvocet, a narcotic analgesic mixed with acetaminophen (Tylenol).

On October 16, 2002, plaintiff returned to see Dr. Spurlock asking for medication for her headaches (Tr. at 201). She said that her Darvocet was almost gone. Dr. Spurlock prescribed Ibuprofen.

On November 8, 2002, plaintiff saw Charles Ash, M.D. (Tr. at 195-196, 198). Plaintiff complained of migraines, pain at the back of the neck radiating into the left shoulder and upper thoracic region, lumbosacral pain, pain in the right shoulder radiating to the elbow, and pain at the base of the right thumb. Plaintiff had stopped smoking four months earlier.

On exam, plaintiff moved about satisfactorily without limp or list, she walked on toes and heels satisfactorily, she was able to squat 25 percent normally, she had no

difficulty arising from the exam table or chair, dressing or undressing. Plaintiff had limited range of motion in her neck with tenderness throughout. She had tenderness throughout the thoracic spine and lumbosacral region, but normal range of motion. She had normal range of motion in her upper extremities, no weakness, deformity, or atrophy. She had some tenderness in the shoulder area. Plaintiff had normal range of motion of the hips, knees, and ankles with no weakness, deformity, or atrophy.

Dr. Ash took new x-rays which showed mild C5-6 and C6-7 degenerative disc disease. "Examination is otherwise unremarkable." He diagnosed mild generalized degenerative arthritis. "It is not felt that she is permanently and totally disabled for ordinary work for which she is fitted."

Plaintiff's alleged onset of disability was November 21, 2002.

On December 5, 2002, plaintiff returned to see Dr. Spurlock, complaining of headaches and right shoulder pain (Tr. at 200). Dr. Spurlock diagnosed headaches and right shoulder pain. He recommended propranolol, a beta blocker used to treat hypertension.

On December 13, 2002, plaintiff went to Dr. Spurlock's office to see if he had written her "disability letter" yet

11

(Tr. at 203).  Dr. Spurlock wrote in the notes:  "I can
comment that she has arthritis in her neck and has pain, but
I really don't have the [illegible] of data needed to fill
out the disability form (they want to know how much of this
and that type of activity she can do, etc.) and just
mentioning the pain won't help them determine if she is
disabled (they can't really count pain for much).  So really
the functional assessment or independent evaluation by a
disability specialist is what she needs.  If she wants a
letter that tells what I know of her pain, etc. I can do
that (but it won't help her much)."  There is another note
on the record which reads:  "Pt requests you go ahead with
the letter."

On December 18, 2002, plaintiff returned to see Dr.
Spurlock complaining of chest pain off and on (Tr. at 202).
He diagnosed chest pain - atypical, and headaches.  The
remainder of the record is illegible.

That same day, Dr. Spurlock wrote a letter to
plaintiff's attorney in aid of her disability application
(Tr. at 206-207).  Dr. Spurlock described plaintiff's
complaints of "vague intermittent chest pain".  He continued
as follows:

12

Another problem that she's having is chronic headaches. These are fairly severe sometimes disabling to her. We have not been able to successfully treat them or find out the exact etiology of these headaches and again, her history is sketchy since she has difficulty describing her symptoms. . . . [She] has used Darvocet in the past for her headache pain but nothing has really been that effective. We tried placing her on a regimen of propranolol and that also did not have much effect on the headaches thus far. It appears that they maybe either migraine or some kind of a complicated tension headache and I have requested and recommended that she see a headache specialist in that regard.

Otherwise, the patient has some various musculoskeletal complaints such as back and right shoulder pain. . . .

In regards to this I have recommended that she see a physiatrist or other type of doctor that would be qualified to evaluate her various musculoskeletal complaints since they don't seem to be from any specific obvious diagnosis to me and I am hesitant to call it simply arthritis without more direct evidence to prove that.

On January 13, 2003, plaintiff saw Dr. Spurlock for a follow up on chest pain (Tr. at 222). He assessed atypical chest pain and headaches. He recommended plaintiff stay off cigarettes, see a physiatrist, and try Celebrex, a non-steroidal anti-inflammatory.

On January 30, 2003, plaintiff saw Dr. Spurlock (Tr. at 221). She stated that the Celebrex helped her chest pain and she requested more Celebrex. Dr. Spurlock diagnosed a sinus infection and headaches. He gave her more samples of Celebrex and prescribed Toprol, a beta blocker used to treat

13

hypertension.

On February 12, 2003, plaintiff saw Dr. Spurlock for a follow up on a sinus infection and to refill her medication for her right shoulder pain (Tr. at 219). He assessed sinusitis, chest well pain "better", and left shoulder pain. He refilled her Darvocet.

On March 26, 2003, plaintiff was seen at the Dallas County Family Medical Center complaining of back pain after having bent over (Tr. at 218). Plaintiff also complained of headaches. "Stopped all meds 'to get out of my system'". Plaintiff's gait and station were normal; her spine, ribs, and pelvis were normal. The doctor diagnosed hypertension and low back pain. He advised plaintiff to restart her Toprol and Celebrex.

On April 7, 2003, plaintiff saw Dr. Spurlock for a blood pressure check (Tr. at 217). Plaintiff said that when she is off work, her headaches are better. Dr. Spurlock diagnosed hypertension and tension headaches. He prescribed Toprol.

On April 30, 2003, plaintiff saw Dr. Spurlock complaining of adverse reaction to Toprol and discontinued it (she had some swelling in her face) (Tr. at 216). The remainder of the record is illegible.

14

On July 28, 2003, plaintiff returned to see Dr. Spurlock complaining of headaches (Tr. at 215). The remainder of this record is illegible.

On August 20, 2003, plaintiff saw Dr. Spurlock for a follow up on her high cholesterol (Tr. at 213). He diagnosed hyperlipidemia and started plaintiff on Lipitor[2] samples.

On September 16, 2003, plaintiff saw Dr. Spurlock's nurse complaining of a headache after having been struck in the head with a child's toy (Tr. at 212). The nurse assessed a headache. The nurse wrote, "Exam within normal limits today despite multiple complaints. Really unable to further assess without diagnostic testing such as MRI recommended by Dr. Spurlock. Patient requests he write a letter stating his recommendation for her caseworker to see if they will approve MRI. Will do this."

On September 24, 2003, Dr. Spurlock wrote a letter to whom it may concern (Tr. at 209). The letter reads as follows:

> This is a letter to outline the complaints and physical symptoms suffered by Ms. Hill that is necessitating our consideration for her to get an MRI of her head.

---

[2]Lipitor blocks the production of cholesterol in the body.

The patient has a significant family history of aneurysms. She has been having some progressive headaches recently that are certainly suspicious for that sort of an etiology as one of the most sinister possibilities. However, Ms. Hill has no insurance and obviously no funds that will allow her to cover such an expense as an MRI. Nonetheless, this is the test that is needed to definitively rule out aneurysms or other cerebral and brain lesions that could be responsible for this kind of problem. Obviously, if she did have aneurysm causing symptoms there would be the chance that it could be a growing aneurysm and something that could be potentially life threatening.

It is my hope that Connie would somehow qualify for some medical assistance in regards to this at least on a temporary basis so that we could try to get these tests covered for her.

On November 25, 2003, plaintiff returned to see Dr. Spurlock after she hit her shoulder and head on something at work (the description is illegible). Her gait and station were normal; her spine, ribs, and pelvis were normal. Dr. Spurlock diagnosed "neck strain - reaggravated old shoulder/neck problem", and headache due to hitting her head. He recommended no heavy lifting, heat and ice to the area, plaintiff should be off work for two days and should consider physical therapy. He gave plaintiff a trigger point injection.

On January 5, 2004, plaintiff was seen by Jeffrey Woodward, M.D., a neurologist (Tr. at 229-230). Portions of Dr. Woodward's report read as follows:

16

HISTORY OF PRESENT ILLNESS: This is a 55-year-old female who indicates initial work injury occurring on about 11/24/03. She states at that time she was working in a freezer at Hardees and was bent over. As she stood up, she reports hitting the back of her head on metal rack. . . . Today, she states that she did have an onset of radiating left lower neck pain and pain into the left scapular region. On the day of injury, she developed radiating left upper extremity discomfort and numbness down to the wrist. Today, she states that she must have "ripped and torn" neck and shoulder areas with the work injury. . . .

Currently, the patient reports frequent headache pain with some pre-existing headache history. . . . The patient reports diffuse neck pain in both upper and lower cervical segments after work injury. . . . The patient lately reports frequent neck pain. She does note at times having only mild neck discomfort, which increases with activity. . . .

PMH:
1. Before work injury, patient indicates taking Darvocet for headaches five days weekly.
2. Initially denies any significant neck disorder preinjury. The patient then seems to indicate some sort of thoracic injury post MVA in 1980 from a head-on collision. No prior cervical radicular symptoms.
3. Hypercholesterolemia.
4. Hypertension.
5. Thyroid disorder.
6. Today, the patient reports hitting her mid-back on a refrigerator at work in February of 2003. She stated that she paid for treatments for this problem herself and states that she wished she had reported it as a work injury. She states she did not report this work injury because she did not want to lose her chance at getting Social Security Disability. Indicates outpatient P.T. [physical therapy] for left shoulder and mid-back following February 2003 injury.

17

SOCIAL HISTORY: Today, the patient states that she has been applying for Social Security Disability for over two years. Disabling condition noted as headaches.

WORK HISTORY: Employed at Hardees preparing biscuits three hours each morning three to four days weekly. The patient has been off work since injury and released by family doctor to lift up to 10 pounds maximum. . . .

Dr. Woodward recommended that plaintiff start taking Vioxx, a non-steroidal anti-inflammatory, and begin an outpatient physical therapy program for her work-related neck injury. Under work status, Dr. Woodward wrote, "Full-time modified duty per RTE. Frequent lift, push, pull 0-15 pounds maximum."

On January 12, 2004, plaintiff was seen by Dr. Woodward (Tr. at 228). He wrote, "Patient reviews multiple other medical problems and concerns including some significant anxiety regarding various medical conditions. Patient would appear to have some either somatoform or hypochondriacal tendencies, in my opinion." Dr. Woodward recommended a cervical MRI to evaluate left C6-7 paraspinal pain and left radicular symptoms. He also prescribed Zanaflex, a muscle relaxer. Under work status, he wrote, "Full-time modified duty per Employer's Report."

On January 21, 2004, plaintiff was seen by Dr. Woodward (Tr. at 227). Her reviewed her cervical MRI films and found

18

mild left C5-6 disc protrusion with apparent mild neural impingement with no other abnormality noted. Plaintiff continued to complain of frequent left lower neck aching pain and left scapular pain and stiffness. She said that taking Zanaflex causes sedation with pain relief and is helpful at night. "Plaintiff seems to indicate she is performing part-time modified work activities. I reviewed current work restrictions with her today." Dr. Woodward recommended outpatient physical therapy and Ultram, also called Tramadol and used to treat pain. Under work status, Dr. Woodward wrote, "Full-time modified duty per Employer's Report."

On February 4, 2004, plaintiff was seen by Dr. Woodward (Tr. at 226). She had attended four physical therapy exercise sessions. Plaintiff was taking Darvocet intermittently, prescribed by her family doctor, and Zanaflex. She had not filled her Ultram prescription. Plaintiff stated that she had a Medicaid card, had seen Dr. Paff within the past month who recommended a five-pound lifting restriction, and she had also applied for Social Security disability. Dr. Woodward recommended a left upper extremity EMG, and told plaintiff to take Zanaflex as needed.

On February 20, 2004, plaintiff was seen by Dr. Woodward (Tr. at 225). He noted that her recent EMG was normal for cervical radicular screen. Plaintiff continued to complain of left neck and shoulder pain. "Patient has attended several outpatient PT [physical therapy] visits . . . She notes no significant or specific pain relief so far with PT. She has been provided with some home neck exercises." Dr. Woodward stated that plaintiff had no clear surgical cervical abnormalities, and plaintiff stated she would refuse surgery anyway. He found that plaintiff had mild-moderate pain with light palpation at C5-7 and in the upper trapezius region. She had full flexion and extension. He recommended that she complete her physical therapy treatments with a home exercise program and that she take Zanaflex as needed. "No other medical tests or treatment to recommend." Under work status, Dr. Woodward wrote, "Full-time work duties per Employer's Report."

**C.    *SUMMARY OF TESTIMONY***

During the February 11, 2004, hearing, plaintiff testified; and Cathy Hodgson, a vocational expert, testified at the request of the ALJ.

20

**1.  Plaintiff's testimony.**

At the time of the administrative hearing, plaintiff was 55 years of age and is currently 57 (Tr. at 40, 41). She is five feet four inches tall and weighs about 130 pounds (Tr. at 41).  Plaintiff has a high school diploma (Tr. at 41).  Plaintiff is divorced (Tr. at 41).  She and her boy friend live in a rented house (Tr. at 42-43). Plaintiff's boy friend receives a small VA check and he began receiving Social Security disability benefits shortly before the administrative hearing (Tr. at 43).  Plaintiff's boy friend is disabled due to a back condition (Tr. at 43). At the time of the hearing, they had been together for 11 or 12 years (Tr. at 43).

Plaintiff wakes up around 4:00 in the morning with a headache (Tr. at 44).  She takes her medicine and then goes back to sleep for about three hours (Tr. at 44).  Plaintiff gets up and cleans for about an hour, then she sits down to rest (Tr. at 44).  She may drive to the store (Tr. at 44). Plaintiff does laundry about every other day (Tr. at 44). She does her dishes, she sweeps, she mops, she cleans the bathroom, she makes her bed, she feeds the dog, and she walks to the mailbox to get the mail but that leaves her out of breath (Tr. at 45-47).  Plaintiff can button buttons,

21

pick up coins, and write, but sometimes she has difficulty (Tr. at 47). Plaintiff does not read because even with her glasses, reading gives her headaches (Tr. at 48). Plaintiff goes to church once in a while on Sundays (Tr. at 48). She used to play the guitar, but she no longer does because it hurts her arms, fingers, and shoulders (Tr. at 48). Plaintiff used to walk on her hands, but she cannot do that anymore because it hurts her wrists (Tr. at 49).

Plaintiff's boy friend takes her everywhere (Tr. at 44). He cooks more than plaintiff does (Tr. at 45). Plaintiff has three grown children, and one of her grandchildren, who was almost six months old at the time, was living with plaintiff and her boy friend (Tr. at 44). The baby's parents were not ready to settle down, so they "signed him over" to plaintiff and her boy friend (Tr. at 44). Plaintiff's boy friend does more taking care of the baby than she does (Tr. at 45). Plaintiff's boy friend also does the yard work and carries wood in during the winter (Tr. at 45, 48).

Plaintiff injured herself while working at Hardees on November 24, 2003 (Tr. at 42). She currently has a worker's compensation claim pending (Tr. at 42). Plaintiff worked at Hardees since 2001 (Tr. at 42). She works three hours per

22

morning, about three or four days per week earning $5.30 per hour (Tr. at 42).

Plaintiff's physical therapist gave her exercises to do (Tr. at 49). She said it feels good to do them, but her neck and shoulder still bother her (Tr. at 49).

Plaintiff believes she can lift maybe five or ten pounds (Tr. at 50). She can sit for 30 minutes before she needs to stand or walk around (Tr. at 50). Plaintiff stands at work and walks around while making biscuits (Tr. at 50). After an hour and a half, she starts to get a headache and a stomachache (Tr. at 50). On an average day, plaintiff sits up with a headache for three to four hours, and then she needs to lie down and rest for three hours (Tr. at 51, 53). Cold weather bothers plaintiff's neck, and hot weather gives her headaches (Tr. at 52, 56).

Plaintiff used to take Ibuprofen, but it made her have chest pains (Tr. at 55). Her doctor took her off Ibuprofen and told her to take Pepto-Bismol and Rolaids until she can get some Celebrex (Tr. at 55).

After the vocational expert testified that a particular hypothetical person could return to plaintiff's past relevant work as a poultry worker, plaintiff stated that her headaches were worse when she worked at the chicken plant

23

(Tr. at 60).

## 2. Vocational expert testimony.

Vocational expert Cathy Hodgson testified at the request of the Administrative Law Judge. The first hypothetical involved a person who could lift five to ten pounds; sit for 30 minutes; stand for 60 to 90 minutes; walk for ten minutes; needs to rest or recline for three to four hours per day; and needs to avoid extreme cold, sun, and bright lights (Tr. at 58). The vocational expert testified that such a person could not perform any work (Tr. at 58-59).

The second hypothetical involved a person who could frequently lift ten pounds and occasionally lift 20 pounds; sit, stand, or walk for an hour at a time each; sit or stand for a total of six hours per day; and should avoid extreme cold and bright lights (Tr. at 59). The vocational expert testified that such a person could perform plaintiff's past relevant work as a poultry worker (Tr. at 59).

The third hypothetical involved the same abilities as in the second hypothetical except the person could lift only ten pounds occasionally (Tr. at 59). The vocational expert testified that such a person could not do any of plaintiff's past relevant work (Tr. at 59).

24

## V. FINDINGS OF THE ALJ

On June 22, 2004, Administrative Law Judge Martin Spiegel entered his opinion finding plaintiff not disabled (Tr. at 15-22). The ALJ first noted that plaintiff previously filed an application for disability benefits on February 21, 2001, in which disability was alleged beginning March 15, 2000. The application was denied initially and by an Administrative Law Judge. Plaintiff did not seek further appeal, rather she filed new applications for disability benefits (Tr. at 15).

At step one of the sequential analysis, the ALJ found that although plaintiff continues to work 16 hours per week at a fast food restaurant earning $5.30 per hour, that work is not "substantial" according to the regulations (Tr. at 17).

At step two, the ALJ found that plaintiff has the following severe impairments: headaches of mixed etiology, right shoulder repetitive motion injury, and mild degenerative disc disease with chronic back pain (Tr. at 17, 19). He found that her chest and breast pain and knee pain are not severe impairments.

At step three, the ALJ found that plaintiff's impairments do not meet or equal a listed impairment (Tr. at

17).

The ALJ found that plaintiff retains the residual functional capacity to lift and carry 20 pounds occasionally and ten pounds frequently, sit for six hours per day and one hour at a time without a change of position, stand for six hours total and for one hour without rest, walk one hour at a time, and must avoid extreme cold and uncomfortably bright lights. He then found that plaintiff could return to her past relevant work as a chicken cleaner/trimmer as that job is usually performed (Tr. at 21).

Therefore, plaintiff was found not disabled at the fourth step of the sequential analysis.

## VI. *CREDIBILITY OF PLAINTIFF*

Plaintiff argues that the ALJ erred in finding that plaintiff's testimony was not credible.

### A. *CONSIDERATION OF RELEVANT FACTORS*

The credibility of a plaintiff's subjective testimony is primarily for the Commissioner to decide, not the courts. Rautio v. Bowen, 862 F.2d 176, 178 (8th Cir. 1988); Benskin v. Bowen, 830 F.2d 878, 882 (8th Cir. 1987). If there are inconsistencies in the record as a whole, the ALJ may discount subjective complaints. Gray v. Apfel, 192 F.3d 799, 803 (8th Cir. 1999); McClees v. Shalala, 2 F.3d 301,

26

303 (8th Cir. 1993).  The ALJ, however, must make express credibility determinations and set forth the inconsistencies which led to his or her conclusions.  Hall v. Chater, 62 F.3d 220, 223 (8th Cir. 1995); Robinson v. Sullivan, 956 F.2d 836, 839 (8th Cir. 1992).  If an ALJ explicitly discredits testimony and gives legally sufficient reasons for doing so, the court will defer to the ALJ's judgment unless it is not supported by substantial evidence on the record as a whole.  Robinson v. Sullivan, 956 F.2d at 841.

In this case, I find that the ALJ's decision to discredit plaintiff's subjective complaints is supported by substantial evidence.  Subjective complaints may not be evaluated solely on the basis of objective medical evidence or personal observations by the ALJ.  In determining credibility, consideration must be given to all relevant factors, including plaintiff's prior work record and observations by third parties and treating and examining physicians relating to such matters as plaintiff's daily activities; the duration, frequency, and intensity of the symptoms; precipitating and aggravating factors; dosage, effectiveness, and side effects of medication; and functional restrictions.  Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984).  Social Security Ruling 96-7p

27

encompasses the same factors as those enumerated in the
Polaski opinion.

The specific reasons listed by the ALJ for discrediting
plaintiff's subjective complaints of disability are as
follows:

> Having had the opportunity to observe the testimony and
> demeanor of the claimant the undersigned finds that
> although she has medically determinable severe
> impairments . . ., these impairments do not cause the
> degree of limitations alleged by the claimant.  The
> limitations alleged by the claimant appear to be more
> of a personal choice rather than impairment or illness
> imposed limitations.  In reaching this conclusion it is
> specifically noted that the specialists who examined
> the claimant do not support her complaints of disabling
> symptoms.  Dr. Woodward, who saw her as recently as
> February 2004, declined to complete a medical source
> statement, and Dr. Ash opined she was able to work.
> While Dr. Spurlock supports the claimant's application
> for disability, he has been unable to provide any
> objective basis for her allegations. . . .
>
> The claimant's work record is erratic, with many
> employers and many years of little or no earnings
> posted, even to years before her alleged onset of
> disability.  This raises a question as to the
> claimant's motivation to work and diminishes her
> credibility in this proceeding.
>
> The claimant's self-reported daily activities are
> inconsistent with her allegations of incapacity.
> Rather than being essentially bedfast as she alleges,
> she shops, drives an automobile, and works part time in
> a fast food restaurant.  The claimant testified as to a
> wide range of daily activities.  She stated that she
> was able to prepare meals; do dishes; dust; clean the
> bathroom; sweep and mop; watch television; go for short
> walks; make her bed; do laundry; occasionally visit
> friends and relatives; provide care for her pet dog.
> She stated that she was able to use her hands and

28

fingers albeit with pain. She stated that she exercised in an attempt to relieve her symptoms. She stated that she was occasionally able to attend religious services but that she was no longer able to play the guitar, attend VFW meetings and walk on her hands. She stated that her medications caused chest pain. The claimant also stated that she occasionally provides care for her six month old grandchild. Further, there is no report of muscle wasting, which indicates that she continues to move about on a fairly regular basis.

(Tr. at 19-20).

### 1. PRIOR WORK RECORD

As the ALJ stated in his order, plaintiff's prior work record is sporadic, she worked for many employers, and she earned very little money. For example, in 1987, plaintiff worked for Long John Silver's; O K Foods; New Haven Rest., Inc.; Meadows Motel; Todd, Inc.,; and A Taste of Yesteryear (Tr. at 80). Even with those six employers, plaintiff earned only $5,070.10 that year. In 1988, plaintiff worked for Brownwood Manor, Taco Time, Beverly Health and Rehabilitation Services, and Dari-Delite of Van Buren (Tr. at 80-81). From those four employers, she earned a total of $4,027.23. This factor supports the ALJ's credibility determination.

### 2. DAILY ACTIVITIES

As the ALJ pointed out, plaintiff testified that she cleans, does laundry, does her dishes, sweeps, mops, cleans

29

the bathroom, makes her bed, feeds the dog, walks to the
mailbox to get the mail, can button buttons, pick up coins,
write, goes to church, helps take care of her infant
grandchild who lives with her and her disabled boy friend,
and stands for several hours per day making biscuits at
Hardees.  Plaintiff's daily activities are not consistent
with her allegations of disability.  This factor supports
the ALJ's credibility determination.

**3.   *DURATION, FREQUENCY, AND INTENSITY OF SYMPTOMS***

Plaintiff claims to have constant pain.  The record
establishes, however, that her pain is not disabling.
Plaintiff is able to work several hours a day in a fast-food
restaurant.  She is able to help take care of her infant
grandchild.  Her doctors have prescribed only muscle
relaxers and non-steroidal anti-inflammatories, with the
exception of two prescriptions for Darvocet, which is a
narcotic analgesic.  On one occasion when plaintiff asked
Dr. Spurlock to refill her Darvocet, he told her to take
Ibuprofen, an anti-inflammatory.  Plaintiff's doctors did
not regularly prescribe medication for severe pain.  This
factor supports the ALJ's credibility determination.

30

### 4. PRECIPITATING AND AGGRAVATING FACTORS

Plaintiff alleges constant pain; therefore, there do not appear to be any precipitating or aggravating factors.

### 5. DOSAGE, EFFECTIVENESS, AND SIDE EFFECTS OF MEDICATION

As mentioned above, plaintiff's doctors routinely prescribed very mild medications and physical therapy for her pain. In February 2001, plaintiff was prescribed a muscle relaxer and an anti-inflammatory. In April 2001, she was prescribed an anti-inflammatory. No other medication was prescribed over the next 16 months. In August 2002, plaintiff was given anxiety medication for her tension headaches. In September 2002, she was given a prescription for Darvocet. A month later she tried to get a refill of Darvocet, but her doctor told her to take an anti-inflammatory. In December 2002, she was prescribed medication for hypertension. In January 2003, she was given an anti-inflammatory. Later that month, she was prescribed medication for hypertension. In February 2003, plaintiff was given another prescription for Darvocet. In March 2003, she was given an anti-inflammatory and hypertension medication. In April 2003, her hypertension medicine was renewed. In August 2003, plaintiff was given medication for high cholesterol. In November 2003, plaintiff had a trigger

31

point injection after an injury at work, and her doctor recommended she apply heat and ice. In January 2004, plaintiff was given another anti-inflammatory. Later that month she was given a muscle relaxer. The end of January 2004, plaintiff was given a prescription for Ultram, a pain reliever, but she did not fill that prescription, despite having Medicaid. In February 2004, plaintiff was given a muscle relaxer. Later that month, she was given more of the muscle relaxer, and the doctor had no other medication or treatment to recommend.

The record is clear that plaintiff has been on only minor pain medication consisting almost entirely of muscle relaxers and anti-inflammatories. There is no evidence that any doctor who has ever seen plaintiff thought her pain was disabling, as evidenced by her prescriptions. Even Dr. Spurlock, who in his letter to plaintiff's attorney in connection with her disability application referring to plaintiff's headaches as "sometimes disabling to her", prescribed only muscle relaxers and anti-inflammatories with the exception of one prescription for Darvocet. This factor supports the ALJ's credibility determination.

Case 6:05-cv-03313-REL   Document 10   Filed 05/30/06   Page 32 of 41

## 6.    FUNCTIONAL RESTRICTIONS

In November 2003, Dr. Spurlock recommended "no heavy lifting" but did not specify how much plaintiff should lift. The only other evidence in the record of any functional restrictions is in a record by Dr. Woodward who said that plaintiff told him she had been seen by Dr. Paff who told her not to lift more than five pounds. However, there is no record from Dr. Paff anywhere in this file. In addition, Dr. Woodward restricted plaintiff's lifting to 15 pounds but only on a temporary basis.

No doctor has ever recommended that plaintiff restrict her sitting, standing, walking, reaching, or any other physical activity. Even Dr. Spurlock did not see fit to place a pound-limit on plaintiff's lifting, he only recommended that she not do "heavy" lifting. By early 2004, plaintiff was on no physical restrictions.

This factor supports the ALJ's credibility determination.

## B.    CREDIBILITY CONCLUSION

Despite all of the evidence discussed above, plaintiff argues that the ALJ did not consider her claims that she could only walk to the mailbox and was then out of breath, that her boy friend provides more care for their live-in

33

grandson than she does, that her boy friend prepares most of the meals, etc. Plaintiff's testimony that she is out of breath after walking to the mailbox is clearly contradicted by her testimony that she walks at work for three to five hours each day making biscuits. Plaintiff attempted to make it appear that her boy friend does most of the work around the home and taking care of plaintiff's grandson. However, plaintiff's boy friend is receiving disability benefits, and plaintiff told Dr. Woodward that she did not report a work-related injury in February 2003 because she did not want to "lose her chance" at getting Social Security disability. She told him that she paid for her own treatment for this alleged injury; however, in February 2003, plaintiff saw one doctor, and that was for a sinus infection, not for any work-related injury.

The ALJ considered all of the evidence in the record and properly reached the conclusion that plaintiff's allegations are not credible. Therefore, plaintiff's motion for summary judgment on this basis will be denied.

### VII. PSYCHOLOGICAL CONSULTATIVE EXAMINATION

Plaintiff next argues that the ALJ erred in choosing not to obtain a psychological consultative examination. Plaintiff argues that there is evidence that plaintiff

34

suffered from possible low I.Q. because she said she attended special education classes and she graduated at the bottom of her class.

The ALJ had this to say about the psychological consultative exam:

> The claimant's representative has argued that there are indications in the record of possible mental retardation, and has asked that psychological testing be done. In this regard, it is noted that the claimant is a high school graduate but alleges enrollment in special education courses. However, she stated that she has a history of semi-skilled work as a certified nurse's aide, and her written submissions to the Social Security Administration are the work of a woman who is literate. Likewise, her ability to play both the guitar and the piano, well enough to play and sing in church, are inconsistent with a diagnosis of mental retardation. Further, the medical evidence does not support a diagnosis of mental retardation.
>
> The claimant's primary care physician referred her to neurologist Elvin Hamlin, D.O. Dr. Hamlin examined her on April 13, 2001, and found her to be alert and oriented, with no evidence of a cognitive or language impairment. Dr. Hamlin's opinion is not controverted in the medical evidence.
>
> Finally, it is noted that the claimant's school records do not show enrollment in special education classes, although this may have occurred. Rather, the claimant took such courses as French, Business Math, and bookkeeping, in addition to required courses in English, government, science, and mathematics, as well as home economics.
>
> In view of the foregoing, it is found that the claimant does not suffer from mental retardation. Indeed, it is difficult to imagine that psychological testing would

alter this finding when all of the evidence was
considered.  Thus, psychological testing is not
required to complete the record in this case.

(Tr. at 17).

Since there was no evidence of any disabling mental
symptoms, much less restrictive impairments, in the medical
record, the ALJ was not required to order a consultative
psychological examination.  See Anderson v. Shalala, 51 F.3d
777, 779 (8th Cir. 1995).  Therefore, plaintiff's motion for
summary judgment on this basis will be denied.

### VIII. PLAINTIFF'S RESIDUAL FUNCTIONAL CAPACITY

Plaintiff next argues that the ALJ failed to provide a
proper residual functional capacity because the ALJ failed
to consider plaintiff's non-severe impairments:  chronic
obstructive pulmonary disease, mental retardation,
gastroesophageal reflux disease, depression, knee pain, and
chest pain.

Plaintiff was diagnosed with chronic obstructive
pulmonary disease in July 2001 when she was a smoker.
Plaintiff subsequently quit smoking on the advice of her
doctor.  There is no further mention of chronic obstructive
pulmonary disease in the record.  In addition, plaintiff was
never prescribed any medication for chronic obstructive
pulmonary disease, nor did she ever complain about chronic

36

obstructive pulmonary disease during any medical
appointments after she stopped smoking.

As discussed above, there is no evidence of mental
retardation in the record, other than plaintiff's
unsubstantiated claims that she was in special education in
high school. As the ALJ pointed out, plaintiff's high
school curriculum does not appear to be a special education
curriculum.

There are very few mentions of gastroesophageal reflux
disease in the record. Plaintiff said she was told to take
Pepto-Bismol, and when she discussed her symptoms of GERD
with her doctors, she routinely told them she felt better if
she could burp. There is no evidence that plaintiff's GERD,
for which she was not prescribed anything but over-the-
counter medication, affects her physical ability to work.

In July 2001, plaintiff told Dr. Atkinson that she had
been suffering from depression for more than eight years;
however, she had never been diagnosed with depression or
treated for depression. Plaintiff saw Dr. Atkinson in
connection with her application for disability benefits.
Plaintiff did not complain to her treating physicians about
depression. Dr. Atkinson diagnosed depression based solely
on plaintiff's allegations, and he recommended only

Case 6:05-cv-03313-REL   Document 10   Filed 05/30/06   Page 37 of 41

depression therapy, not depression medication. There is no evidence that plaintiff sought out depression therapy or raised this issue with any treating physician. There simply is no credible evidence that plaintiff suffered from depression.

There is no evidence that plaintiff suffers from knee problems. Dr. Ash found that plaintiff has normal range of motion of her knees. Plaintiff did not complain of knee problems to any doctor.

In January 2003, plaintiff was diagnosed with atypical chest pain and was told to stay off cigarettes and try Celebrex. Plaintiff reported that the Celebrex helped her chest pain. By February 2003, one month later, plaintiff's chest pain was better. There are no other reports of chest pain in the record.

The ALJ is required to formulate a residual functional capacity based on all of the credible evidence of record. 20 C.F.R. §§ 404.1545, 416.945. The ALJ's residual functional capacity is based on the medical evidence in the record, including evidence that plaintiff was never restricted from sitting, standing, or walking; that no doctor ever prescribed strong pain medication for plaintiff; that plaintiff's medications consisted almost entirely of

38

anti-inflammatories and muscle relaxers; that plaintiff was able to perform many functions during the day including standing, walking, and making biscuits for three to four hours multiple days per week.

The burden of proving a residual functional capacity rests with the claimant in a Social Security disability case. Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001). In this case, the substantial evidence in the record supports the ALJ's determination that plaintiff has the residual functional capacity to lift and carry 20 pounds occasionally and ten pounds frequently, sit for six hours per day and one hour at a time without a change of position, stand for six hours total and for one hour without rest, walk one hour at a time, and must avoid extreme cold and uncomfortably bright lights. Therefore, plaintiff's motion for summary judgment on this basis will be denied.

## IX. *PAST RELEVANT WORK*

Finally, plaintiff argues that the ALJ erred in finding that plaintiff could perform her past work because he failed to indicate the demands of her past work as a chicken cleaner/trimmer. During the administrative hearing, the ALJ solicited testimony from the vocational expert about plaintiff's past relevant work. The vocational expert

testified that plaintiff's past work as a chicken cleaner or trimmer was performed at the light exertional level and was unskilled work (Tr. at 58). She also testified that a chicken cleaner/trimmer is light work in the national economy. Therefore, the evidence before the ALJ is that plaintiff's past relevant work as a chicken cleaner/trimmer was performed by plaintiff at the light exertional level and is normally performed at the light exertional level.

Because plaintiff retains the residual functional capacity to perform light, unskilled work, the substantial evidence in the record supports the ALJ's finding that she can return to her past relevant work as a chicken cleaner or trimmer. Plaintiff's motion for summary judgment on this basis will therefore be denied.

## X.    CONCLUSIONS

Based on all of the above, I find that the substantial evidence in the record as a whole supports the ALJ's finding that plaintiff is not disabled. Therefore, it is

ORDERED that plaintiff's motion for summary judgment is denied. It is further

40

ORDERED that the decision of the Commissioner is
affirmed.


                                    /s/ Robert E. Larsen
                                    ROBERT E. LARSEN
                                    United States Magistrate Judge

Kansas City, Missouri
May 30, 2006

Case 6:05-cv-03313-REL   Document 10   Filed 05/30/06   Page 41 of 41